**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
West Palm Beach Division
Case No.:9:18-cv-81250-DIMITROULEAS

| | |
|---|---|
| WYNDHAM VACATION OWNERSHIP, INC. a Delaware corporation; WYNDHAM VACATION RESORTS, INC., a Delaware corporation, WYNDHAM RESORT DEVELOPMENT CORPORATION; an Oregon Corporation, SHELL VACATIONS, LLC, an Arizona limited liability company; SVC-WEST, LLC, a California limited liability company; SVC-AMERICANA, LLC, an Arizona limited liability company; and SVC-HAWAII, LLC, a Hawaii limited liability company,<br><br>      Plaintiffs,<br><br>v.<br><br>CLAPP BUSINESS LAW, LLC, a Missouri limited liability company; MARY CLAPP, ESQ., an individual; THE TRANSFER GROUP, LLC, a Missouri limited liability company; VACATION CONSULTING SERVICES, LLC, a Missouri limited liability company; VCS COMMUNICATIONS, LLC, a Missouri limited liability company; REAL TRAVEL, LLC, an Arkansas limited liability company; and BART BOWE, an individual; BRIAN SCROGGS, an individual; TRANSFER FOR YOU LLC, a Missouri limited liability company; ALLIED SOLUTION GROUP, LLC, a Missouri limited liability company; JJ MIDWEST MARKETING LLC, a Missouri limited liability company; JJ&C MARKETING, LLC, a Missouri limited liability company; THE MID-WEST TRANSFER, LLC, a Missouri limited liability company; MIDWEST TRANSFERS LLC, a Missouri limited liability company; and JOSH UNGARO, an individual,<br><br>      Defendants. | **AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |

Plaintiffs Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); Shell Vacations, LLC ("SV"); SVC-West, LLC ("SVC-West"); SVC-Americana, LLC ("SVC-Americana"); and SVC-Hawaii, LLC ("SVC-Hawaii") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants; Clapp Business Law, LLC ("Clapp Law"); Mary Clapp, Esq. ("Clapp")(Clapp Law and Clapp may sometimes hereinafter be referred to as the "Clapp Law Defendants"); The Transfer Group, LLC ("Transfer Group"); Vacation Consulting Services, LLC ("VCS"); VCS Communications, LLC ("VCS Communications"); Real Travel, LLC ("Real Travel"); Brian Scroggs ("Scroggs"); Bart Bowe ("Bowe")(Transfer Group, VCS, VCS Communications, Real Travel, Scroggs, and Bowe may sometimes hereinafter be referred to as the "VCS Defendants"); Transfer For You LLC ("Transfer For You"); Allied Solution Group, LLC ("Allied"); JJ Midwest Marketing LLC ("JJ Midwest"); JJ&C Marketing, LLC ("JJ&C"); The Mid-West Transfer, LLC ("The Mid-West Transfer"); Midwest Transfers LLC ("Midwest Transfers"); and Josh Ungaro ("Ungaro")(Transfer For You, Allied, JJ Midwest, JJ&C, The Mid-West Transfer, Midwest Transfers, and Ungaro may sometimes hereinafter be referred to as the "Midwest Defendants"); (the VCS Defendants and the Midwest Defendants, may sometimes hereinafter be referred to as the "TPE Defendants"), and state as follows:

## I.    INTRODUCTION

### A.    Background on the Timeshare Industry.

1.      This action is based on the simple premise that it is inherently false and misleading for a non-party to a contract to advertise and sell any ability to release one of the parties to that contract from the obligations of that contract, or to otherwise legally cancel or terminate that contract without any consequences.

- 2 -

2.      Prior to the creation of the timeshare industry, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

3.      Resort developers, like Wyndham, develop vacation properties where the developer can divide a single vacation unit between 52 owners, with each owner purchasing a fractional interest of the whole for a specified share of the total price, i.e. deeded ownership. Developers, like Wyndham, also sell membership interests to consumers in the form of points, which are exchanged for use at Wyndham properties.  Wyndham owners may also belong to an exchange program, which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumer's choices.

4.      Thus, consumers enjoy regular vacations for a fraction of the typical cost and without the burdens associated with undivided vacation property ownership (such as being solely responsible for taxes, maintenance, and repairs). Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year.

5.      Timeshare ownership is a contractual relationship.  Wyndham has valid and binding contracts (the "Timeshare Contracts") with identifiable individuals who purchased timeshare interests from Wyndham (the "Wyndham Owners").  The Timeshare Contracts control the benefits and obligations of timeshare ownership between the Wyndham Owners and Wyndham.

### B.      Background on the Timeshare Exit Industry.

6.      Recently, a nefarious cottage industry known as "timeshare exit" has sprouted. This industry preys upon unsuspecting timeshare owners, including Wyndham Owners, inducing them into breaching their binding Timeshare Contracts, causing harm to both the Wyndham

- 3 -

Owners and Wyndham.  This scheme is not limited to just Wyndham Owners and Wyndham, and has targeted the timeshare industry as a whole.

7.     Timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with damaged or ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare developer, such as Wyndham, directly or utilizing one of the many programs created by the timeshare industry for consumers, such as the Wyndham Ovation® program.

8.     Defendants are not parties to the Timeshare Contracts.  Yet, despite this, they falsely advertise a "cancellation," "exit," or "transfer" service that purports to "legally" or "painlessly" release or "exit" Wyndham Owners from the obligations of their Timeshare Contracts.

9.     Defendants even guarantee results – that is, Defendants guarantee that Wyndham Owners will be legally and permanently exited from their Timeshare Contracts if they use Defendants' services.  The following is a representative advertisement made by VCS exhibiting such behavior: [1]

> NOW there is a new program where your maintenance fees are guaranteed to be paid on points you can't use from year to year. This has been one of our most successful programs as Wyndham owners finally have a GUARANTEED relief. Over 4,000 Wyndham owners have signed up so far!

10.     Because a guarantee of this nature would violate the Florida Bar Rules of Professional Conduct if advertised directly by the lawyer and law firm defendants – the Clapp

---

[1] Excerpted from http://www.vacationconsultingservices.com/wyndham-maintenance-fee-protection as it appeared circa October 28, 2016.

Law Defendants[2] -- the non-lawyer Defendants publish these advertisements and then refer any "clients" to the Clapp Law Defendants for purported legal representation.

11.     Through these false and misleading advertisements, Defendants deceive hundreds of Wyndham Owners into retaining Defendants, including the Clapp Law Defendants, at substantial cost, to implement Defendants' purported "cancellation" or "transfer" services related to their Timeshare Contracts.

12.     Unfortunately for these Wyndham Owners, the "services" Defendants sell typically result in an outcome very different than what Defendants promise.

13.     Upon being retained, Defendants instruct, deceive, induce, or persuade Wyndham Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, as a means of facilitating the "exit", "cancellation", or "transfer."  Even if they state otherwise in writing, Defendants instruct, deceive, induce, or persuade Wyndham Owners to stop making payments under the Timeshare Contracts.  There are three purposes to doing this:

      a.     it helps Defendants justify their fees by claiming that the Wyndham Owner is saving money by not making payments to Wyndham as required by the Timeshare Contracts;

      b.     related to paragraph 13(a), *supra*, it diverts the funds of the Timeshare Owners from Wyndham to Defendants, causing Wyndham damages; and

      c.     it ensures a Wyndham Owner will go into default, and foreclosure, on their Timeshare Contract, allowing Defendants to claim success at

---

[2] Rule 4-7.13(b), Florida Rules of Professional Conduct, states, "Deceptive or inherently misleading advertisements include, but are not limited to advertisements that contain: (1) statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results; . . . ."

- 5 -

"exiting" a Wyndham Owner from their Timeshare Contract, a false and misleading characterization which harms the Wyndham Owner.

14.     Defendants do not disclose to the Wyndham Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will actually result in an unlawful breach of the Timeshare Contracts due to non-payment, leading to a non-judicial foreclosure of their timeshare interests.

15.     Nevertheless, after the Timeshare Contracts are foreclosed, Defendants then misrepresent to these former Wyndham Owners that they were successful in "cancelling" or "exiting" their Timeshare Contracts.

16.     Alternatively, Defendants may negotiate a surrender or deed-in-lieu on behalf of Wyndham Owners, while failing to inform the Wyndham Owners that doing so also has substantial negative impacts on the credit and finances of Wyndham Owners.

17.     Cancellation or rescission of a contract is very different in nature than a breach and termination.  But Defendants advertise the former only to mislead Wyndham Owners into the latter.

18.     Each Wyndham Owner pays Defendants thousands of dollars to essentially breach a Timeshare Contract that the Wyndham Owner could have breached on his or her own, for free. Defendants' "cancellation" services are therefore illusory, and the Wyndham Owners often do not realize the scam until after the damage is done when their credit rating is badly hurt due to the default and/or foreclosure.

19.     Under the Florida Statutes, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Wyndham Owners that can be exercised within a

certain time period following the execution of a Timeshare Contract. *See* Fla. Stat. § 721.10.  It is not a service that can be advertised, sold, or provided in commerce.

20.     Defendants will also fraudulently transfer a Wyndham Owner's interest via quitclaim deed or similar instrument, without the required approval of Wyndham, to a shell entity or strawman buyer who then fails to make payments on the timeshare interest as required. Because the transfer was not approved, Wyndham looks to the original Wyndham Owner for payment while that Owner is completely unaware that he or she is still the legal owner of the timeshare interest.  The Florida Vacation Plan and Timesharing Act specifically prohibits this scheme of fraudulent transfers, commonly known as a "Viking Ship".  *See* Fla. Stat. § 721.17.

21.     Defendants, acting both separately and in concert (as further detailed hereinbelow), have caused Wyndham millions of dollars in damages.  Each Defendant plays a specific role necessary to effectuate and complete the scams.  An Organizational Chart showing the inter-relationship amongst the Defendants is annexed hereto as Exhibit 1.

22.     Wyndham has no other option but to actively and aggressively seek damages and injunctive relief to prevent Defendants from inflicting further damage to Wyndham's business and, most importantly, to its relationships with Wyndham Owners.

## C.     <u>Overview of the Complaint.</u>

23.     In pursuing its legal and equitable remedies here, Wyndham is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Wyndham is also protecting Wyndham Owners from further harm, and timeshare owners at large, who have been scammed and negatively impacted by Defendants' wrongful conduct.

24.     This Amended Complaint requests damages and injunctive relief for false advertising and contributory false advertising in violation of the Lanham Act, 15 U.S.C. §

- 7 -

1125(a)(1) and under the causes of action for a defendant making false and/or misleading representations about its own goods or services (authorized by *Pom Wonderful, LLC v. Coca-Cola Co.* 573 U.S. 102 (2014) and *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)), intentional interference with contractual relations, civil conspiracy, and violations of the Florida Deceptive and Unfair Trade Practices Act.

## II.   PARTIES, JURISDICTION, AND VENUE

### A.   The Plaintiffs

25.     Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

26.     Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

27.     Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

28.     Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

29.     Plaintiff SVC-West, LLC is a limited liability company organized and existing under the laws of the state of California with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

30. Plaintiff SVC-Americana, LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

31. Plaintiff SVC-Hawaii, LLC is a limited liability company organized and existing under the laws of the state of Hawaii with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

## B. The Defendants

32. A better understanding of how the Defendants are all interlinked (as set forth herein below) can be obtained through reference to Exhibit 1.

### 1. *The Clapp Law Defendants*.

33. The Clapp Law Defendants are the lawyer and law firm utilized by the TPE Defendants to carry out their schemes.

34. Clapp Law is a limited liability company organized and existing under the laws of the State of Missouri with a registered principal place of business located at 636 West Republic Road, Suite A116, Springfield, Missouri 65807. In reality, Clapp Law operates out of Suite F104 at that same address, next to the VCS Defendants. A copy of the Missouri Secretary of State information for Clapp Law is annexed hereto as Exhibit 2. Photographs from Google Street View® showing the actual location of Clapp Law is annexed hereto Composite Exhibit 3.

35. Clapp is an individual and resident of the State of Missouri and is otherwise *sui juris*.

### 2. *The VCS Defendants*.

36. The VCS Defendants are a group of companies and individuals that work together as a timeshare exit company.

37.     Transfer Group is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 636 West Republic Road, Suite F100, Springfield, Missouri 65807.  *See* Composite Exhibit 3.  A copy of the Missouri Secretary of State information for Transfer Group is annexed hereto as Exhibit 4.

38.     Vacation Consulting is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 636 West Republic Road, Suite F100, Springfield, Missouri 65807.  *See* Composite Exhibit 3.  A copy of the Missouri Secretary of State information for Vacation Consulting is annexed hereto as Exhibit 5.

39.     VCS is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 636 West Republic Road, Suite F100, Springfield, Missouri 65807.  *See* Composite Exhibit 3.  A copy of the Missouri Secretary of State information for Vacation Consulting is annexed hereto as Exhibit 6.

40.     Real Travel is a limited liability company organized and existing under the laws of the State of Arkansas with a principal place of business located at 1202 NE McClain Road, Bentonville, Arkansas 72712.  A copy of the Arkansas Secretary of State information for Real Travel is annexed hereto as Exhibit 7.

41.     Bowe is an individual and resident of the State of Missouri and is otherwise *sui juris*.

42.     Scroggs is an individual and resident of Nixa, Missouri, and is otherwise *sui juris*. Scroggs is a former Wyndham employee who was fired by Wyndham.

3.     *The Midwest Defendants*.

43.     The Midwest Defendants are a group of companies and individuals that work together as a timeshare exit company and marketing company serving the timeshare exit industry.

44.     Transfer For You is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 402B W Mt. Vernon Street, #112, Nixa, Missouri 65714.  A copy of the Missouri Secretary of State information for Transfer For You is annexed hereto as Exhibit 8.

45.     Allied is a limited liability company organized and existing under the laws of the State of Missouri with a registered address located at 1875 N Calhoun Avenue, Nixa, Missouri 65714.  A copy of the Missouri Secretary of State information for Allied is annexed hereto as Composite Exhibit 9.  Allied's principal place of business is located at 1335 E Republic Road, Suite D, Springfield, Missouri 65804.

46.     JJ Midwest Marketing is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 1885 N Hwy CC, Suite A, Nixa, Missouri 65714.  A copy of the Missouri Secretary of State information for JJ Midwest Marketing is annexed hereto as Exhibit 10.

47.     JJ&C Marketing is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 1335 E Republic Road, Suite F, Springfield, Missouri 65804.  A copy of the Missouri Secretary of State information for JJ&C Marketing is annexed hereto as Exhibit 11.  Suite F at 1335 E Republic Road in Springfield, Missouri is a business named 'Ship It', which provides mailbox services and is also owned by Ungaro.  In reality, JJ&C Marketing operates out of the same location as Allied and The Mid-West Transfer.

48.     The Mid-West Transfer is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business allegedly located at

1335 E Republic Road, Suite B, Springfield, Missouri 65804.  A copy of the Missouri Secretary of State information for The Mid-West Transfer is annexed hereto as Exhibit 12.

49.      Midwest Transfers is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 4121 S Fremont Avenue, Suite 120, Springfield, Missouri 65804.  A copy of the Missouri Secretary of State information for Midwest Transfers is annexed hereto as Exhibit 13.

50.      Ungaro is an individual and resident of the State of Missouri and is otherwise *sui juris*.

### C.      Subject Matter Jurisdiction

51.      This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### D.      Personal Jurisdiction

52.      This Court has personal jurisdiction over the Defendants for the following reasons:

> a.      over Clapp and Clapp Law because Clapp is an attorney registered with the Florida Bar and the managing partner of Clapp Law, which has a business address located at 9940 Town Center Parkway, Lakewood Ranch, Florida 34202; Clapp and Clapp Law also direct correspondence to Wyndham in Orlando, Florida;

> b.      over all other Defendants because their actions, as more fully described herein below, are directed at consumers across the country, including

consumers in the state of Florida. All Defendants operate websites that are freely accessible from Florida and target consumers in the State of Florida, which involves, *inter* alia, the repeated transmission of files over the Internet in, to, and out of the State of Florida;

c. over all Defendants as they operate together and cause false demand letters to be directed to Wyndham in the State of Florida, indeed, all actions of Defendants are designed to interfere with Wyndham's business, which involves the repeated use of the wires and mails by Defendants to transmit correspondence and other items into the State of Florida; and

d. at least some of the Timeshare Contracts and Timeshare Owners at issue in this civil action were entered into in Florida or are Florida residents.

53. For the foregoing reasons, the Court has personal jurisdiction over all Defendants.

**E. Venue**

54. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, because the Defendants ultimately harm the consuming public and Wyndham in Florida, and Defendants' conduct giving rise to the claims set forth herein occurred in this District.

**F. Conditions Precedent, Attorneys' Fees**

55. All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

56. Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are

- 13 -

recoverable against Defendants pursuant to 15 U.S.C. § 1117 and the Florida Deceptive and Unfair Trade Practices Act, and other statutes, as set forth in greater detail herein.

## III. THE WYNDHAM ENTITIES

57. Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

58. Wyndham Vacation Ownership, Inc. is the parent company or ultimate parent company of three entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, and Shell Vacations LLC.

59. As part of its business, WVR, WRDC, SV, SVC-West, SVC-Americana, and SVC-Hawaii enter into timeshare contracts with consumers (e.g., the Wyndham Owners).  At the time owners purchase timeshares from WVR, WRDC, SV, SVC-West, SVC-Americana, and/or SVC-Hawaii, the owners execute the Timeshare Contracts wherein the now-Wyndham Owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to Wyndham for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the now-Wyndham Owners agree to pay a pro-rated share of the property taxes to Wyndham which is then submitted by Wyndham to the appropriate local tax collectors. Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement and become part of the Timeshare Contract.  These Timeshare Contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

## IV.     LINKS BETWEEN THE VARIOUS DEFENDANTS

60.     There are a number of links between the various Defendants, as shown in Exhibit

1.  Wyndham will set forth those links in greater detail hereinbelow.

### A.     The VCS Defendants are All Interrelated

61.     All of the VCS Defendants are linked to each other as they are a series of

businesses that Bowe and Scroggs have operated, closing down (or claiming to close down) the

businesses as consumer complaints have mounted against them.

62.     Recently, the Better Business Bureau ("BBB") issued an alert for VCS, Scroggs,

and Transfer Group:

> ⚠ **PATTERN OF COMPLAINT:**
> Better Business Bureau is advising consumers to use caution when considering doing business with Vacation Consulting Services, its owner
> Brian J. Scroggs, or an affiliated company at the same location, The Transfer Group.  BBB has received a pattern of consumer complaints
> alleging misleading advertising, company was unsuccessful in extricating ...
> Read More                                                                                                                          ✗

63.     The alert continues:

ORLDOCS 16582391 3

## Alert

**Pattern of Complaint**

Better Business Bureau is advising consumers to use caution when considering doing business with Vacation Consulting Services, its owner Brian J. Scroggs, or an affiliated company at the same location, The Transfer Group.  BBB has received a pattern of consumer complaints alleging misleading advertising, company was unsuccessful in extricating consumers from their timeshare contracts, failure to issue refunds, failure to cancel a contract with the company, and overall poor customer service.

On December 8, 2017, BBB sent a letter to the company with its concerns. On February 1, 2018, the company responded to BBB indicating that rapid growth attributed to the problems cited by consumers.  The company stated that it has addressed any advertising concerns, has installed project managers to oversee customer service and that if a client cancels within the rescission period, they will receive a refund within 7-10 days.  However, those customers who claim not to have received a refund are those who have broken the terms of the contract.

BBB maintains a separate report for The Transfer Group which can be found by clicking here:

https://www.bbb.org/us/mo/springfield/profile/timeshare-transfer/the-transfer-group-llc-0734-45145

In April 2018, Scroggs opened a third timeshare cancellation business, Real Travel, LLC, at the Republic Road address.  A link to that company's BBB Business Profile is available here:

https://www.bbb.org/us/mo/springfield/profile/timeshare-cancellation/real-travel-llc-0734-1000010266

64.     In response to the BBB alert, the Douglas County Herald, a local newspaper in Ava, Missouri, reported that Scroggs was in the process of closing VCS and Transfer Group and had a new business, Real Travel, operating out of the same location.  A copy of this report is annexed hereto as Exhibit 14.

65.     There are additional links between the different VCS Defendants.  Witnesses J. C. and S. C. entered into an illusory 'Service Agreement' with VCS Communications, a copy of which is annexed hereto as Exhibit 15,

> a.     that document states that "Meg Stephens" would be the 'Project Manager' for J. C. and S. C., VCS's website lists 'Meg Stephens' as VCS's receptionist; and

b.    that document lists the phone number for the VCS Communications 'customer service department' as (417) 883-5515, which is the phone number for VCS.

66.    Additionally,

a.    VCS Communications' business cards, an example of which is annexed hereto as Exhibit 16, list (417) 883-5515 as the 'office' number (which is the same phone number as VCS), an email domain of *@vcsus.com, which is the same email domain used by VCS, and employees (such as Joy Hagstrom) who are or were really employees of VCS (Ms. Hagstrom is no longer employed by the VCS);

b.    no matter which entity contacted the consumer, the VCS Defendants provide a 'welcome letter' from Transfer Group, an example of which is annexed hereto as Exhibit 17, the bottom of which lists two persons – one with a VCS telephone number and email domain, and one with a Transfer Group telephone number and email domain; and

c.    no matter which entity contacted the consumer, the VCS Defendants have the consumer sign a 'Limited Power of Attorney' to Transfer Group, an example of which is annexed hereto as Exhibit 18.

67.    The VCS Defendants are all interrelated and are alter-egos of each other as they blur the lines between them through sharing employees, owners, officers, business addresses, telephone numbers, email addresses, and inter-referring business to each other, and generally work together.

- 17 -

B.     **The Midwest Defendants are All Interrelated**

68.     The Midwest Defendants are all interrelated as they all operate out of the same location, all have a common founder, employee, and owner (Ungaro), and are all controlled by Ungaro.

69.     Additionally, the Midwest Defendants (with the exception of Ungaro) enter into contracts together and collectively, an example of which is annexed hereto as Exhibit 19.

C.     **The VCS Defendants Work With the Midwest Defendants**

70.     The VCS Defendants work with the Midwest Defendants as shown in Exhibit 19. This work (CRM software and lead generation) is directly related to the issues raised in this civil action.

71.     Vacation Consulting was sued in a consumer class action for violating the Telephone Consumer Protection Act (TCPA).  *See* Case No. 17-cv-00774, formerly pending in the United States District Court of the Eastern District of Missouri.

72.     Vacation Consulting, in the TCPA lawsuit, denied that it had violated the TCPA, but also brought a third-party claim against its marketing partners, including JJ&C.  Vacation Consulting alleged that any TCPA violation had been committed by its marketing partners, including JJ&C, and not by Vacation Consulting itself.

73.     Vacation Consulting works with the Midwest Defendants to engage in advertising activities.

D.     **The TPE Defendants All Work with the Clapp Law Defendants**

74.     Because the advertised services promise a legal result – i.e., a canceled contract – the TPE Defendants retain and affiliate with lawyers who purportedly represent the Wyndham Owners in their demands that Wyndham agree to cancel the Timeshare Contracts.

75.     Previously, the VCS Defendants worked with a law firm known as Castle Law.  A copy of an email from Scroggs, copying Bowe, to Castle Law is annexed hereto as Exhibit 19. Castle Law was formed and operated by Judson Phillips.   The Tennessee Supreme Court disbarred Phillips in August "because he could not successfully defend himself" against multiple fraud charges related to the timeshare exit industry.  A copy of an article from the *Nashville Post* is annexed hereto as Exhibit 20.

76.     Subsequently, VCS began misrepresenting to the public that it had 'acquired' Castle Law, *see* Exhibit 21, annexed hereto.

77.     However, because VCS had not acquired Castle Law, VCS, and the other TPE Defendants, needed a new lawyer and/or law firm with which to affiliate.

78.     This is the role filled by the Clapp Law Defendants.

79.     The Clapp Law Defendants have agreed to represent the timeshare owners, including Wyndham Owners, solicited by the TPE Defendants' advertisements.

80.     The TPE Defendants even disseminate information about the Clapp Law Defendants at their presentations.

81.     Attached as Exhibit 22 is an information sheet about "client next steps," on Clapp Law letterhead, that Real Travel uses when a Wyndham Owner procures Real Travel's services. The other TPE Defendants make similar referrals to the Clapp Law Defendants.

82.     Clapp Business Law, with Clapp at the helm, therefore knows about, contributes to, and materially participates in the false advertising by the TPE Defendants as detailed herein.

83.     In 2017 and 2018 alone, Wyndham received approximately 200 demand letters from the Clapp Law Defendants, on Clapp Business Law letterhead and the bulk executed by Clapp, on behalf of Wyndham Owners.

84.     The letters allege various misrepresentations by Wyndham's representatives during the inducement and formation of the Timeshare Contracts.

85.     These 'demand letters' are mostly gibberish with little to no cogent or possible legal theory behind them.  These letters regularly contain baseless statements, such as:

> a.     stating that "I have determined that serious and fraudulent misrepresentations were made during the sales process which have caused and are continuing to cause harm to my clients" without stating anything further (and, in fact, the alleged 'fraudulent misrepresentations' are never disclosed by the Clapp Law Defendants to Wyndham);
>
> b.     alleging that Wyndham has violated 'Regulation N', which is apparently a reference to 12 CFR § 1014 *et seq*., without making any statement as to how Regulation N applies or which of the specifically enumerated representations (12 CFR § 1014.3) were allegedly violated, or making improper allegations as to which portions of Regulation N were allegedly violated;
>
> c.     making identical, or nearly identical, statements in many of the demand letters sent to Wyndham; and
>
> d.     making identical, unfounded demands on Wyndham for rescission of contract, satisfaction and release of all obligations, reimbursement and refund of all monies paid, removal of all credit reporting, and cease all contact with the Wyndham Owners.

86.     After the initial letters, the Clapp Law Defendants fail to do anything to prosecute the alleged cases of their alleged clients.  This is despite the fact that the Clapp Law Defendants

end their letters to Wyndham by stating "If I do not hear from you within thirty (30) days, I have

been authorized to pursue all contractual, legal, and equitable remedies available to my clients".

The Clapp Law Defendants do not prosecute any of their cases with Wyndham.  This is because

the Clapp Law Defendants tell consumers who are recruited by the TPE Defendants that

| What services will CBL provide? | CBL provides legal analysis and negotiation services to obtain relief from obligations owed to and financed by the resort or its affiliates. The services do not include relief from any independent or third- party financing, such as Paypal or Client's personal bank financing. The initial engagement for a client with a timeshare dispute includes the following: <br> • Prompt notice of representation to the resort <br> • Attorney consultation regarding specific facts of case <br> • Evaluation of client's timeshare documents and facts <br> • Fact and law specific demand letter <br> • Notification to credit reporting agencies of disputed obligation <br> • Negotiation back and forth with the Resort <br> • Review and revision of settlement documents. <br> • Monitoring settlement process until relief is obtained. <br> **THE INITIAL ENGAGEMENT DOES NOT INCLUDE LITIGATION SERVICES OF ANY KIND, AND AN ADDITIONAL FEE AND AGREEMENT WILL BE REQUIRED FOR REPRESENTATION IN ANY LITIGATION.** |
|---|---|
| How long does the process take? | Every case is different, but we find that the typical negotiation process takes 6 to 12 months. We will continue to negotiate on your behalf until settlement is obtained or you and we agree that no settlement is going to occur, at which point we may discuss retention of CBL for litigation. |

.

87.     Thus, the Clapp Law Defendants will do nothing other than 'negotiate' with a

resort, anything further (such as litigation) will require the consumer to negotiate a separate

agreement with the Clapp Law Defendants and make additional payments.  However, because

the consumers have been sold on the idea that they will only pay a flat fee to the TPE Defendants

(and, by extension, the Clapp Law Defendants), there will be no subsequent payment by the

consumer to the Clapp Law Defendants for litigation purposes. If a developer refuses to negotiate with respect to a particular consumer, the Clapp Law Defendants will do nothing further, and the consumer will have paid for nothing more than a demand letter.

88.     Nefariously, because the Clapp Law Defendants' alleged services are frequently sold by the TPE Defendants as part of a package that also includes purchasing additional timeshare points, at the end of the day the consumer will have paid the TPE Defendants for illusory services, paid the Clapp Law Defendants to do nothing more than send a demand letter, will have purchased an additional timeshare interest through the TPE Defendants, *and* will still be responsible for their original timeshare interest.

89.     After the Clapp Law Defendants send the demand letters, the TPE Defendants do little more than facilitate the exchange of information between the Clapp Law Defendants and the Wyndham Owner. In other words, the TPE Defendants' "exit services" merely involve waiting and hoping that the litigation threat by the Clapp Law Defendants will convince Wyndham to cancel or release the Timeshare Contracts at issue. They are based on the gamble that Wyndham will either (1) eventually lose in court if suit is filed or (2) opt to settle and release the Wyndham Owner from his or her Timeshare Contract rather than litigate an action. The advertised "services," therefore, are unreliable and illusory.

90.     As payment for the demand letters, the TPE Defendants pay the Clapp Law Defendants a flat portion of the fees the TPE Defendants receive from the Wyndham Owners.

91.     The Wyndham Owners never pay Clapp Business Law directly.

92.     Such an arrangement violates a number of state bar association rules, including, without limitation, Rule 4-7.22 of the Florida Rules of Professional Conduct, which generally prohibits the splitting of attorney fees with referral sources.

## V.    PERSONAL LIABILITY OF THE INDIVIDUAL DEFENDANTS

93.    The individual defendants are personally liable for the actions of the company defendants with which they are associated.

94.    Scroggs and Bowe are each personally liable for the actions of the VCS Defendants because they personally direct and control the actions of the VCS Defendants, an example of which is shown in Exhibit 20.  Moreover, Scroggs and Bowe personally purposefully defraud Wyndham Owners with no intention of conducting legitimate transfers or terminations of timeshare interests and therefore the other VCS Defendants are shells designed to allow Scroggs and Bowe to carry out illegal activities.  Scroggs and Bowe both personally participate in and direct and control the conduct of the VCS Defendants, such as by directly contacting consumers to lie to them in an attempt to retain business (Scroggs, *see* Exhibit 23 annexed hereto) or personally appearing in videos directed to consumers (Bowe, a copy of the video appears on the website www.thetransfergroup.net).

95.    Ungaro is personally liable for the actions of the Midwest Defendants because he personally directs and controls the actions of the Midwest Defendants.  Moreover, Ungaro personally purposefully defrauds Wyndham Owners with no intention of conducting legitimate transfers or terminations of timeshare interests and therefore the other Midwest Defendants are shells designed to allow Ungaro to carry out illegal activities.

96.    Clapp is personally liable for the actions of Clapp Law as she is the only partner in the firm and has direct and total control over all aspects of the firm and its actions and personally directions and controls the actions of the Clapp Law Defendants.

## VI.     ILLEGAL CONDUCT BY THE DEFENDANTS TO INDUCE BREACHES OF WYNDHAM'S TIMESHARE CONTRACTS

97.     The TPE Defendants deploy various methods of false advertising targeted at Wyndham Owners to solicit the Defendants' so-called "exit" or "transfer" services.

98.     While most of the TPE Defendants operate websites (listed in this Amended Complaint) that advertise their so-called services, they also work independently and jointly to host in-person sales presentations, conduct sales calls, and send mail advertisements to Wyndham Owners. Often, the telemarketing and mail marketing efforts are aimed at getting Wyndham Owners to an in-person sales presentation.

99.     The ultimate goal of the various methods of advertising and solicitation is to convince Wyndham Owners that the TPE Defendants have the ability to either cancel the Timeshare Contracts or transfer the obligations of the Timeshare Contracts. As explained below, the TPE Defendants do not have this ability, and the advertising is, by nature, false and/or misleading.

### A.     False and/or Misleading Advertising

#### 1.     *General Content of the False and/or Misleading Advertising.*

100.     Regardless of the method of advertising, the advertising content is generally consistent (and consistently false and/or misleading) among the numerous TPE Defendants.

101.     At their core, the advertisements falsely represent how the TPE Defendants supposedly assist Wyndham Owners with the termination of their Timeshare Contracts. In short, TPE Defendants mislead Wyndham Owners into thinking that the TPE Defendants' services and commercial activities will lead to a lawful release, rescission, termination, cancellation, or transfer of their Timeshare Contracts, when in reality, TPE Defendants deceive and induce

Wyndham Owners into breaching the Timeshare Contracts which unlawfully terminates those Contracts.

102.    The advertisements are false and/or misleading by including one of more of the following promises about the TPE Defendants' services:

a.      Stating that their services or commercial activities provide an "exit," "cancellation," or "release" of a timeshare contract, or by using any other word or phrase (i.e. "get out") that means or implies the lawful termination of a timeshare contract. The TPE Defendants cannot truthfully advertise, offer, or provide a Wyndham Owner with a lawful termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise or make a public offer regarding Wyndham's timeshare agreements.   Only Wyndham, as a party to such Timeshare Contracts, has the ability to truthfully offer a means of terminating the Timeshare Contracts, which Wyndham does through its Ovation program.

b.      Stating that their services or commercial activities provide a "process" or "method" that results in a timeshare owner being free from the obligations and benefits of a timeshare contract.   The TPE Defendants cannot truthfully advertise to a Wyndham Owner any "process" or "method" that results in a lawful transfer, termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never

authorized the TPE Defendants to advertise, represent, or even suggest that Wyndham participates in any such process to achieve the advertised result.

c.   Stating that their services or commercial activities provide a "legal," "lawful," "legitimate," or "safe" means of terminating or transferring a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract.  The TPE Defendants falsely equate (i) the termination of a Timeshare Contract through breach, default, and/or foreclosure (the actual result of their "cancellation" or "transfer" services) with (ii) a "lawful" or "legitimate" result.  Under basic principles of the law, the breach of any contract is an unlawful and illegitimate means of terminating a contract, which typically subjects the defaulting party to resulting damages in a court of law.  In this way, a breach does not "lawfully" or "legitimately" free or release a Wyndham Owner from the Timeshare Contract, but instead triggers the non-defaulting party's (Wyndham's) rights to seek legal and equitable remedies in court for the unlawful termination.  The contract is never cancelled; to the contrary, it is fully enforced.  Because the Defendants recommend, induce, or persuade Wyndham Owners into stopping payments on their Timeshare Contracts and thus defaulting on those legal instruments, Defendants cannot truthfully advertise that the resulting termination of the Timeshare Contracts is in any way "lawful" or "legitimate."

d.    Stating that their services or commercial activities provide a "guaranteed" means of terminating or transferring a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract.  The TPE Defendants cannot truthfully advertise a "guaranteed" transfer, termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to "guarantee" any lawful transfer, termination, release, or rescission regarding Wyndham's Contracts.  To the extent a Wyndham Owner's breach or default of a timeshare contract "guarantees" its termination, such result does not owe to any service or commercial activity by the Defendants.  To the contrary, a Wyndham Owner can breach a Timeshare Contract without any involvement by Defendants – and for free – therefore the fact that Defendants charge exorbitant fees to deceive and persuade a Wyndham Owner to breach the Timeshare Contract makes evident the scam they perpetuate.

e.    Stating that their services or commercial activities allow a timeshare owner to stop paying mortgage payments or fees, including maintenance fees, or to otherwise avoid the contractual obligations of a timeshare contract.   The TPE Defendants cannot truthfully advertise, offer, or provide a Wyndham Owner with the consequence-free right to stop making payments on a Timeshare Contract, because such result requires the agreement of the other party to such Timeshare Contract, namely

- 27 -

Wyndham. Yet Wyndham has never authorized the TPE Defendants to advertise that a Wyndham Owner can stop making payments or otherwise stop fulfilling the contractual obligations on Wyndham's Contracts.

2. *Online Advertising*.

103. The following quotations from the various TPE Defendants' websites are a non-exhaustive set of examples of the above types of false or misleading statements in advertising.

a. <u>The VCS Defendants.</u>

104. The Transfer Group owns, operates, controls, and/or is otherwise responsible for the content of www.thetransfergroup.net.

105. The content of www.thetransfergroup.net includes or has included the following statements:

a. "There are numerous procedures and documents that go into the transferring of a timeshare property. We take care of it all." (www.thetransfergroup.net)

b. "The Transfer Group specializes in deed and title transfers for timeshare owners who have sold or gifted their property. The Transfer Group also provides avenues for current and future customers to buy, sell or rent properties from a growing inventory list." (www.thetransfergroup.net/about-us)

c. "We have established relationships with numerous timeshare companies to help expedite the process." (www.thetransfergroup.net/services)

d. "How long does it take for the transfer to be completed? Answer: The timeframe and process with each resort can vary. It typically takes

between 60-90 days, but can take up to 180 days (6 months)."
(www.thetransfergroup.net/faq)

106.     Either Vacation Consulting Services or VCS Communications (or both) owns, operates, controls, and/or is otherwise responsible for the content of www.vcscommunications.com.

107.     The content of www.vcscommunications.com has been removed since the initial filing of this lawsuit.

108.     The content of www.vcscommunications.com previously included the following statements:

> a.     "Strategy Specialists. Because of our extensive relationships within the timeshare industry we are uniquely qualified to offer sound strategies that provide relief to timeshare owners. Our services are designed with you in mind." (www.vcscommunications.com)
>
> b.     "Our Mission. Our purpose is to enable individuals to manage their vacation portfolio and maximize their investment by resolving problems, educating and findings solutions." (www.vcscommunications.com)
>
> c.     "For example, as an owner: Do you know the difference between a fixed week, a floating week, UDI points, deeded property, lease property, or trust points? Are you overpaying for your resort? Where there any misrepresentations when you purchased your timeshare? What are your rights as an owner? Do you have an exit strategy in place? These are questions that VCS Communications, LLC answers everyday. We have

discovered a need because an educated owner is a happy owner."
(www.vcscommunications.com/about-us)

d.    "VCS Communications, LLC has relationships with developers to get you out of your timeshare interest.  Call us to see if your timeshare qualifies." (www.vcscommunications.com/services)

e.    "Q2: Can I walk away from my timeshare?  A: You can walk away from any financial obligation as long as you are willing to face the consequences of a foreclosure and your credit getting hit, although bankruptcy laws changed and made it harder to walk away from your debt. If it is a deeded property, you have a debt forever in maintenance fees and taxes and that deed is attached to your estate.  If this is a concern, you should call us and we can go over some of your options.  We would need to ask you some more questions, but you need an EXIT STRATEGY…NOW!" (www.vcscommunications.com/faq)

f.    "Q6: If I use VCS Communications, LLC to relieve me of my timeshare, how long will this process take?   A:   Depending on your specific ownership situation, the process may take 3–12 months." (www.vcscommunications.com/faq)

109.    Vacation Consulting Services owns, operates, controls, and/or is otherwise responsible for the content of www.vacationconsultingservices.com.

110.    The content of www.vacationconsultingservices.com has been removed.

111.    The content of www.vacationconsultingservices.com previously included the following statements:

a.     "SPECIALIZING         IN        TIMESHARE        LIQUIDATION"
       (www.vacationconsultingservices.com)

b.     An "EXIT STRATEGY" page representing that "VCS has relationships
       with developers to get you out of your deed.  Call us to see if your deed
       qualifies." (www.vacationconsultingservices.com/exit-strategy)

c.     "Q2: Can I walk away from my timeshare?  A: You can walk away from
       any financial obligation as long as you are willing to face the
       consequences of a foreclosure and your credit getting hit, although
       bankruptcy laws changed and made it harder to walk away from your debt.
       If it is a deeded property, you have a debt forever in maintenance fees and
       taxes and that deed is attached to your estate.  If this is a concern, you
       should call us and we can go over some of your options.  We would need
       to ask you some more questions, but you need an EXIT
       STRATEGY…NOW!" (www.vacationconsultingservices.com/faq)

d.     This     is     the     exact     same     statement     made     on
       www.vcscommunications.com/faq, quoted above.

e.     "Q6:  If I was lied to about my purchase, can I get out of it? A:  This is
       case by case.  If you still owe money on your mortgage, and it was
       egregious enough, then yes, it is possible. Timeshare companies do not
       support their sales reps if they lie and its [sic] important to remember that
       the salesperson lied to you, not the company. Yes, the salesperson is an
       agent of the company, but the companies want the product to be sold
       cleanly, so they have a vested interest in your satisfaction. But because

you have a three-day rescission period, it is hard if you wait. The sooner you start the process, the better.  If you have waited for over a year or more to fight it or if the resort company did not help you cancel your contract, then there are other options. We would need to ask you more questions before we could recommend a course of action. Contact Us." (www.vacationconsultingservices.com/faq)

f.      "Q8: If I use VCS to relieve me of my timeshare, how long will this process take?  A: It could take up to 12 months for the process to be complete, but in most cases it takes less time." (*Id.*)

g.      The website also contains over a dozen bogus testimonials, including, without limitation, testimonials stating that customers "learned so much about the exit strategy" and that "VCS does what they say.  If you're looking to exit a timeshare, then this is the group to engage." (www.vacationconsultingservices.com/vcs-testimonials)

112.    Real Travel engages in a variety of false and/or misleading advertising on its website (www.realtravelus.com), including:

a.      advertising on its website that it has met with over "16,000 clients in our 6 years of business" even though Real Travel was formed on June 5, 2018;

b.      advertising that it has "industry leading consultants" which is untrue;

c.      repeatedly advertising it is there to help educate consumers, when in reality its purpose is to dupe consumers into paying thousands or tens of thousands of dollars on Real Travel's own timeshare products;

d.   utilizing false reviews by copying many of the alleged 'client testimonials' from VCS's website and Vacation Consulting's website, showing that the 'client testimonials' are false and fabricated;

e.   advertising that "Real Travel has relationships with developers to get you out of your timeshare interest" when no such relationships exist; and

f.   a variety of other false and/or misleading statements on its website: www.realtravelus.com.

113.   As with the CLS Defendants, the VCS Defendants engage in false and/or misleading advertising by utilizing fake consumer reviews, as evidenced by the fact that each company uses the exact same reviews.

b.   The Midwest Defendants

114.   Allied owns, operates, controls, and/or is responsible for the content of www.alliedsolutiongroup.com.

115.   The content of www.alliedsolutiongroup.com includes or has included the following statements:

a.   "EXIT STRATEGIES REFINED.  We go beyond the industry standard to help you maximize your investment."  (www.alliedsolutiongroup.com)

b.   "What is your exit strategy?  No matter the reason, we have the right solution for you." (www.alliedsolutiongroup.com/exit-strategy.html)

c.   "Have you ever asked yourself "Why are we paying all these crazy fees and not even using it?" (www.alliedsolutiongroup.com/exit-strategy.html)

d.   "We have spent our tenure as a company creating and cultivating relationships with industry experts and professionals.  Whether you love your timeshare, loathe your timeshare, or simply don't understand your

- 33 -

timeshare. Regardless of your situation, Allied Solution Group is here to help you. Our services are 100% guaranteed." (www.alliedsolutiongroup.com/exit-strategy.html)

e. "Do you need to liquidate your timeshare? Contact us today so that you can avoid paying more maintenance fees, special assessments or association dues ever again. We offer options to transfer a deed or title on your behalf whether its [sic] to someone you know or someone taking over ownership." (www.alliedsolutiongroup.com/exit-strategy.html)

f. "We offer options to transfer a deed or title on your behalf, whether it is to someone you know or someone taking over your ownership. We are here to assist you." (www.alliedsolutiongroup.com/about-us.html)

g. "Walk Away Program. At Allied Solution Group, we offer a wide range of services, but if you ever choose to discharge and release your ownership, the MWT will take back the property if you so choose with our Walk Away Program." (www.alliedsolutiongroup.com/about-us.html)

h. "Allied Solution Group has transferred thousands of timeshares and helped thousands of owners get out of their contracts." (www.alliedsolutiongroup.com/about-us.html)

116. The Mid-West Transfer owns, operates, controls, and/or is responsible for the content of www.themwt.com.

117. The content of www.themwt.com includes or has included the following statements:

a.    "Are you searching for a way out of your timeshare? We are here to help!" ([www.themwt.com/index.html](www.themwt.com/index.html))

b.    "We develop an exit strategy and execute it with your legal permission, while you and your family can enjoy our 100% success rate." ([www.themwt.com/index.html](www.themwt.com/index.html))

c.    "Walk Away Program.  If you ever choose to discharge and release your ownership, The MWT will take back the property if you so choose." ([www.themwt.com/index.html](www.themwt.com/index.html))

d.    "The Midwest Transfer have transferred thousands of timeshares and have helped thousands of owners get out of their contracts." ([www.themwt.com/index.html](www.themwt.com/index.html))

e.    Do you know if you're overpaying for your resort?  Do you know how ownership affects your children?  Do you know what your ownership benefits are and how to use them?  Have you considered an exit strategy?" ([www.themwt.com/index.html](www.themwt.com/index.html))

f.    "Whether you love your timeshare, loathe your timeshare, or simply do not understand your timeshare.  Regardless of your situation, MWT is here to help you.  Our services are 100% guaranteed." ([www.themwt.com/exit-strategy.html](www.themwt.com/exit-strategy.html))

g.    "Your Timeshare Exit Strategy/  Contact us today so that you can avoid paying more maintenance fees, special assessments or association dues ever again.  We offer option to transfer a deed or title on your behalf, whether it is to someone you know or someone taking over your

ownership. We are here to assist you." ([www.themwt.com/liquidation.html](www.themwt.com/liquidation.html))

h. "The Midwest Transfer has transferred thousands of timeshares and has helped thousands of owners get out of their contracts." ([www.themwt.com/about.html](www.themwt.com/about.html))

i. "Able to offer Immediate Financial Solutions and opportunities." ([www.themwt.com/about.html](www.themwt.com/about.html))

3. *In-Person Sales Presentations*

118. The TPE Defendants conduct much of their sales activity through in-person presentations to Wyndham Owners, which are conducted using scripts and standardized presentations.

119. The TPE Defendants have teams of employees or agents (often called "consultants") who travel the country to make sales presentations to timeshare owners.

120. The presentations typically begin in a speaker-audience setting and end with one-on-one pitches during which the consultants pressure individual Wyndham Owners to procure the advertised "cancellation" or "transfer" services.

121. The consultants follow carefully developed scripts to maximize the pressure and, ultimately, their profit margins.

122. A common scare tactic at these presentations is based on rising maintenance fees.

123. Adding to the sales pressure, the consultants for these TPE Defendants, such as VCS, falsely suggest to Wyndham Owners that their children will be forever burdened by the Owners' timeshare obligations unless a TPE Defendant like VCS cancels or transfers the contracts today.

124.    The consultants for these TPE Defendants use a variety of tricks to deceive Wyndham Owners into believing that a company such as theirs can actually and legitimately cancel or transfer a Timeshare Contract, including, of course, the basic misrepresentation that a company such as theirs can actually and legitimately cancel or transfer a Timeshare Contract.

125.    The money-back guarantee, printed on a brochure or fact sheet, is another gimmick used by these TPE Defendants to deceive Wyndham Owners into believing that their services are without fail.  But the guarantees are false, because when their services predictably fail, the TPE Defendants generally do not give refunds to Wyndham Owners merely because the Timeshare Contracts are ultimately breached rather than legitimately released, cancelled, or transferred.

126.    The consultants employ additional tricks to mislead Wyndham Owners into believing that legitimate grounds exist for canceling their Timeshare Contracts.

127.    The TPE Defendants, through their consultants, purposefully steer Wyndham Owners away from Ovation, Wyndham's legitimate program to terminate Timeshare Contracts, either by denying its existence or by misrepresenting that Ovation costs far more than it actually does.

128.    The TPE Defendants inflate the cost of their so-called cancellation services by including exorbitant attorney's fees in their cost calculations, even though the actual fees they divert to the lawyers are a fraction of what the TPE Defendants advertise and receive.

129.    In addition to the "cancellation" or "transfer" services sold at these in-person presentations, the TPE Defendants often offer a new points-based timeshare membership to "replace" the Wyndham timeshare interests that are being terminated.  The points, however, are

often valued by the TPE Defendants at overinflated prices, then steeply discounted, just to mislead the Wyndham Owners into believing that more value is gained in a package deal.

130.    In other words, if a Wyndham Owner purchases a new timeshare points package, in conjunction with the cancellation services, the price of both will be greatly discounted based on a "trade-in" allowance, "liquidation" discount, or other bogus reduction.

131.    In this way, the sales presentation by the TPE Defendants includes fake costs and fake discounts to deceive Wyndham Owners into paying thousands of dollars just to breach their Timeshare Contracts, a result which the TPE Defendants mislabel as a "cancellation" or "transfer" of the Timeshare Contracts.

132.    Finally, the TPE Defendants usually offer their prospective customers the option of paying with instantly-approved credit card accounts.  These transactions are difficult to challenge when and if the Wyndham Owners eventually discover the fraudulent outcome.

4.    *Telemarketing*

133.    The TPE Defendants promote and advertise their services through telemarketing efforts, as well.

134.    Often the purpose of these telemarketing efforts is to convince Wyndham Owners to attend an upcoming, nearby presentation.

135.    For example, VCS (or its agent(s), one or more of the Midwest Defendants) calls timeshare owners, including Wyndham Owners, offering invitations to nearby presentations with a free meal.  The telemarketers falsely state, based on their predetermined script, that owners who attend will learn how to get rid of their timeshare interests.

136.    Invitations or not, each TPE Defendant has at some point operated a call center itself, or contracted with another marketing entity, to solicit Wyndham Owners with the types of false statements described above.

- 38 -

137.     Vacation Consulting, for example, has acknowledged using co-Defendant JJ&C Marketing for telemarketing services.

138.     The Midwest Defendants, including JJ&C Marketing, conduct telemarketing solicitations on behalf of the other TPE Defendants.

5.     *Direct Mail Advertising*

139.     As with the telemarketing efforts, each TPE Defendant (or its agent) has mailed misleading advertisements to Wyndham Owners.

140.     All of the TPE Defendants have engaged in mail marketing directly, or through a marketing entity, to solicit Wyndham Owners with the types of false statements described above.

141.     The Midwest Defendants publish and mail advertisements on behalf of the other TPE Defendants.

**B.     The False and Misleading Advertisements are Not Puffery**

142.     The advertisements listed in Paragraphs 9, 65, 66, 100-113, and 118-141, and Exhibits 15-18 may sometimes hereinafter be referred to as the "VCS False and Misleading Advertisements".

143.     The advertisements listed in Paragraphs 100-103, 114-117, and 118-141 may sometimes hereinafter be referred to as the "Midwest False and Misleading Advertisements".

144.     The VCS False and Misleading Advertisements, Midwest False and Misleading Advertisements may sometimes hereinafter be collectively referred to as the "False and Misleading Advertisements".

145.     The False and Misleading Advertisements are not puffery.  Thousands of consumers have fallen prey to Defendants' false and/or deceptively misleading advertisements and have retained Defendants to render Defendants' illusory services.  Consumers have paid Defendants thousands or tens of thousands of dollars each for Defendants' 'guaranteed', 'safe',

'proven', and 'effective' 'process', only to have their timeshare interests terminated, cancelled, defaulted, and/or foreclosed for non-payment.  No rational consumer would pay such sums of monies to a third-party to achieve the same results (timeshare termination, cancellation, defaults, and/or foreclosures for non-payment) they could achieve on their own through the simple act of not paying.  Many timeshare owners, including Wyndham Owners, who pay Defendants for their illusory services ultimately suffer the same fate as any other consumer who simply elects not to make payments on their timeshare contracts; the only difference between many consumers who simply stop paying, and those who retain Defendants' illusory services, is that the latter group of consumers lose additional thousands or tens of thousands of dollars to Defendants on top of what they lose by defaulting on their payment obligations.

146.    Defendants' false and misleading advertisements cause direct harm to Wyndham. The False and Misleading Advertisements make false and/or deceptively misleading statements about Defendants' products and services, and Wyndham's products and services.  Defendants exist for the sole purpose of interfering in Wyndham's contracts with the Wyndham Owners. Because Wyndham Owners can be either a customer of Defendants, or a customer of Wyndham, but not both, they are competitors and there is a direct relationship between Defendants false and/or deceptively misleading advertising and harm to Wyndham in that the False and Misleading Advertisements are solely designed to induce Wyndham Owners into retaining Defendants, who then immediately instruct those Wyndham Owners to cease making payments to Wyndham.

## VII.    WYNDHAM'S RIGHT TO INJUNCTIVE RELIEF

147.    Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to and/or persuasion of the Wyndham Owners to stop making payments on the Timeshare Contracts, including all mortgage, maintenance, and tax

payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation with Plaintiffs, is harming Plaintiffs.

148.    Defendants continue to engage and intend to further engage in the unlawful conduct described above.

149.    Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

150.    The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying.

151.    Non-defaulting Wyndham Owners are also damaged because the non-payment of taxes and maintenance fees by the defaulting Wyndham Owners force the non-defaulting Wyndham Owners to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

152.    Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

153.    Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this tortious conduct.

154.    The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' relationships outweigh the harm, if any, that an injunction would cause to Defendants.

155.     The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and the interests of the Wyndham Owners, and by restraining the unlawful, disruptive and tortious actions committed by Defendants.

156.     Moreover, Wyndham has a right to injunctive relief under both the Lanham Act and the Florida Deceptive and Unfair Trade Practices Act.

## VIII.   CAUSES OF ACTION

**COUNT I**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the VCS Defendants)

157.     Wyndham adopts and realleges paragraphs 1-67, 70-73, 74-94, 97-99, 100-103, and 118-156 above as if fully set forth herein.

158.     This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for the VCS Defendants' false and misleading advertisements regarding the VCS Defendants' own products and services.

159.     The VCS Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the VCS Defendants' False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

160.     The VCS Defendants' False and Misleading Advertisements described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for the VCS Defendants' own financial gain, for the purpose of influencing consumers to retain the VCS Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

161.    The VCS Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

162.    The VCS Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

163.    The VCS Defendants deceive the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners, and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

164.    The VCS Defendants' advertised services affect interstate commerce.

165.    The VCS Defendants are operating as competitors to Wyndham. Once a Wyndham Owner enters into an agreement with a VCS Defendant, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

166.    Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

167.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of the action.

168.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the VCS Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the VCS Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the VCS Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the VCS Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT II**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the Midwest Defendants)

169.    Wyndham adopts and realleges paragraphs 1-60, 68-69, 70-73, 74-93, 95, 100-103, and 114-156 above as if fully set forth herein.

170.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for the Midwest Defendants' false and misleading advertisements regarding the Midwest Defendants' own products and services.

171.    The Midwest Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the Midwest Defendants' False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

172.     The Midwest Defendants' False and Misleading Advertisements described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for the Midwest Defendants' own financial gain, for the purpose of influencing consumers to retain the Midwest Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

173.     The Midwest Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

174.     The Midwest Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

175.     The Midwest Defendants deceive the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners, and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

176.     The Midwest Defendants' advertised services affect interstate commerce.

177.     The Midwest Defendants are operating as competitors to Wyndham.   Once a Wyndham Owner enters into an agreement with a Midwest Defendant, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

178.     Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

179.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of the action.

180.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Midwest Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the Midwest Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Midwest Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the Midwest Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT III**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the Clapp Law Defendants)

181.    Wyndham adopts and realleges paragraphs 1 through 156 above as if fully set forth herein.

182.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

183.    The TPE Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead

- 46 -

consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

184.    Wyndham has been and continues to be injured as a result of the TPE Defendants' false and misleading statements.

185.    The Clapp Law Defendants have contributed and continue to contribute to the TPE Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

186.    The Clapp Law Defendants explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.  Without the Clapp Law Defendants' willingness to accept those consumers as clients, the TPE Defendants could not advertise what they do.

187.    The TPE Defendants false advertisements are public, serious, and widespread, and the Clapp Law Defendants have full knowledge of such advertising and condones it.

188.    More than that, the Clapp Law Defendants financially gain from the false advertisements in the form of client referrals and fee splitting with the TPE Defendants.

189.    In other words, the Clapp Law Defendants' business derives much, if not all, of its revenue from the consumers solicited through the TPE Defendants false and/or misleading advertising, more specifically, the False and Misleading Advertisements.

190.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising by the TPE Defendants, (ii) the Clapp Law Defendants' profits resulting from the TPE Defendants' false advertising to Wyndham Owners, and (iii) the costs of the action.

191.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by the Clapp Law Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Clapp Law Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the Clapp Law Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Clapp Law Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the Clapp Law Defendants from further contributing to the False and Misleading Advertising, including accepting any clients solicited by the TPE Defendants through the false advertisement of any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT IV**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the VCS Defendants)

192.    Wyndham adopts and realleges paragraphs 1-73, 94-95, and 97-156 above as if fully set forth herein.

193.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

194.    The Midwest Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

- 48 -

195.    Wyndham has been and continues to be injured as a result of the Midwest Defendants' false and misleading statements.

196.    The VCS Defendants have contributed and continue to contribute to the Midwest Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

197.    The VCS Defendants explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.

198.    The Midwest Defendants false advertisements are public, serious, and widespread, and the VCS Defendants have full knowledge of such advertising and condones it and/or directs it.

199.    More than that, the VCS Defendants financially gain from the false advertisements in the form of client referrals from the Midwest Defendants.

200.    In other words, the VCS Defendants' business derives substantial revenue from the consumers solicited through the Midwest Defendants false and/or misleading advertising, more specifically, the Midwest False and Misleading Advertisements.

201.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false and/or misleading advertising by the Midwest Defendants, (ii) the VCS Defendants' profits resulting from the Midwest Defendants' false and/or misleading advertising to Wyndham Owners, and (iii) the costs of the action.

202.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by the VCS Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the VCS Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the VCS Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the VCS Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the VCS Defendants from further contributing to the Midwest False and Misleading Advertising, including accepting any clients solicited by the Midwest Defendants through the false advertisement of any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT V**
**Tortious Interference with Contractual Relations**
(against the VCS Defendants and Clapp Law Defendants)

203.    Wyndham adopts and realleges paragraphs 1-67, 94, and 96-156 above as if fully set forth herein.

204.    This is a cause of action for tortious interference with contractual relations.

205.    Wyndham has contractual relationships with its timeshare owners.

206.    The VCS Defendants and Clapp Law Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which the VCS Defendants and Clapp Law Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the contractual relationships between Wyndham and the Wyndham Owners, the VCS Defendants and Clapp Law Defendants would have no reason to exist.

207.    The VCS Defendants and Clapp Law Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

208.    In particular, the VCS Defendants and Clapp Law Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting identifiable Wyndham Owners[3] and persuading them to hire the VCS Defendants and Clapp Law Defendants to help "cancel" (in reality, breach) their Timeshare Contracts. The VCS Defendants and Clapp Law Defendants also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

209.    If Wyndham Owners knew the truth about the VCS Defendants' and Clapp Law Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to the VCS Defendants and Clapp Law Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

210.    The VCS Defendants and Clapp Law Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

211.    The VCS Defendants' and Clapp Law Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant

---

[3] The specific Wyndham Owners and Timeshare Contracts are identifiable.  However, due to the substantial volume and length of said documents it is not practical to attach all of them to this Complaint as they would make the Complaint likely thousands, if not tens-of-thousands of pages long.  Wyndham can provide the identities and documents in discovery.  Moreover, Defendants are already aware of the identities of these Wyndham Owners and Timeshare Contracts as Defendants sent Wyndham letters related to these Wyndham Owners and Timeshare Contracts.

consequences naturally, directly, and proximately resulting from the VCS Defendants' and Clapp Law Defendants' actions and without reasonable grounds for the VCS Defendants and Clapp Law Defendants to believe that their actions were justified and proper.

212.    As a direct and proximate result of the VCS Defendants' and Clapp Law Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.  These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

213.    The VCS Defendants and Clapp Law Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the VCS Defendants and Clapp Law Defendants are strangers to the contractual relationships between Wyndham and its Owners, and their interference with Plaintiffs' business is willful and malicious.

214.    Furthermore, the VCS Defendants and Clapp Law Defendants profit greatly by accepting significant fees from Wyndham Owners then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts.  The VCS Defendants and Clapp Law Defendants are not privileged to interfere with Wyndham's contractual relationships because the VCS Defendants and Clapp Law Defendants act in their own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by them or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free, or at a much lower cost, by appealing directly to Wyndham or utilizing the Ovation® program.

Furthermore, the VCS Defendants and Clapp Law Defendants undermine the Clapp Law Defendants' so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Wyndham Owners for the equitable rescission of those Timeshare Contracts. The VCS Defendants and Clapp Law Defendants across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

215.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

216.    Plaintiffs are entitled to damages against the VCS Defendants and Clapp Law Defendants jointly and severally.

217.    The VCS Defendants' and Clapp Law Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

218.    The VCS Defendants' and Clapp Law Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the VCS Defendants and Clapp Law Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the VCS Defendants and Clapp Law Defendants and their agents, representatives, employees, and affiliates, prohibiting the VCS

Defendants and Clapp Law Defendants from contacting Wyndham Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Wyndham Owners.

## COUNT VI
### Civil Conspiracy
(against all Defendants)

219.     Wyndham adopts and realleges paragraphs 1 through 156 above as if fully set forth herein.

220.     This is a cause of action for civil conspiracy to interfere with existing contractual relations and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

221.     Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

222.     Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' contractual relations with it owners and collectively causing its owners to breach their Timeshare Contracts with Plaintiffs.

223.     Each Defendant committed or engaged in an overt act in furtherance of their unlawful conspiracy to interfere with Plaintiffs' contractual relations or to induce Plaintiffs' customers to breach their Timeshare Contracts.

224.     Defendants conspired to interfere with Plaintiffs' contractual relationships with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Wyndham Owners.

225.    As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those Contracts.

226.    Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

227.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Wyndham and its business millions of dollars in actual damages.

228.    Defendants are jointly and severally liable to Plaintiffs for damages.

229.    Defendants maliciously and purposefully act, using shell companies and numerous websites, as well as lawyers who only advertise other fields of legal practice, to hide their misconduct, and to divert and abscond with funds from Wyndham Owners and interfere with the contractual relationships between Wyndham Owners and Wyndham.

230.    Defendants acted willfully and with malice in taking these actions.

231.    Defendants' conduct therefore entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate

**COUNT V**
**Violations of Florida's Deceptive and Unfair Trade Practices Act**
(against all Defendants)

232.    Wyndham adopts and realleges paragraphs 1 through 156 above as if fully set forth herein

233.    This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

234.    Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

235.    Wyndham Owners are consumers for purposes of FDUTPA.

236.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

237.    Defendants are engaged in deceptive and unfair practices, including luring Wyndham Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Wyndham consumers to pay substantial fees to "cancel" their contracts with Wyndham, when, in many instances, a lawful termination is only available to consumers directly from Wyndham, a party to the Timeshare Contracts, through the Ovation® Program or otherwise.

238.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

239.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than

the actual damage remedy under § 510.211(2), Fla. Stat. *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

240.     Wyndham is a party aggrieved by Defendants' violation of FDUTPA, Section 501.204(1), Fla. Stat.

241.     As a result of Defendants' actions, Wyndham has suffered financial loss.

242.     Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

243.     Wyndham is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter injunctive relief against all Defendants, award Plaintiffs their costs, including their reasonable attorney's fees, and for such other and further relief as the Court deems appropriate.

ORLDOCS 16582391 3

Dated: December 10, 2018

                       */s/ Alfred J. Bennington, Jr.*
                       **ALFRED J. BENNINGTON, JR., ESQ.**
                       Florida Bar No. 0404985
                       bbennington@shutts.com
                       **GLENNYS ORTEGA RUBIN, ESQ.**
                       Florida Bar No. 556361
                       grubin@shutts.com
                       **SHUTTS & BOWEN LLP**
                       300 South Orange Avenue, Suite 1600
                       Orlando, Florida 32801
                       Telephone: (407) 835-6755
                       Facsimile:  (407) 849-7255

                       and

                       **DANIEL J. BARSKY, ESQ.**
                       Florida Bar No. 25713
                       dbarsky@shutts.com
                       **SHUTTS & BOWEN LLP**
                       200 South Biscayne Boulevard, Suite 4100
                       Miami, Florida 33131
                       Telephone: (561) 650-8518
                       Facsimile:  (561) 822-5527

                       *Attorneys for Plaintiffs*

ORLDOCS 16582391 3